IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KELLY M. SULLIVAN,                    )
                                      )
                Plaintiff,            )
                                      )
        v.                            )       Case No.
                                      )       13-0691-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
                Defendant.            )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kelly Sullivan seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title XVI of the Social

Security Act ("the Act").  Plaintiff argues that the ALJ erred in (1) failing to give controlling

weight to the opinion of her treating psychiatrist, Shahbaz Khan, M.D., (2) improperly

assessing plaintiff's residual functional capacity, and (3) improperly finding plaintiff not

credible.  I find that the substantial evidence in the record as a whole supports the ALJ's finding

that plaintiff is not disabled.  Therefore, plaintiff's motion for summary judgment will be

denied and the decision of the Commissioner will be affirmed.

## I.     BACKGROUND

On July 7, 2010, plaintiff applied for disability benefits alleging that she had been

disabled since January 1, 2006.  In her application plaintiff alleges that her disability stems

from hypertension, hyperlipidemia, obesity, diabetes, anxiety, sleep apnea, neuropathy[1] in her

---

[1]"Peripheral neuropathy, a result of nerve damage, often causes weakness, numbness and
pain, usually in your hands and feet, but it may also occur in other areas of your body.  People
generally describe the pain of peripheral neuropathy as tingling or burning, while they may
compare the loss of sensation to the feeling of wearing a thin stocking or glove. Peripheral
neuropathy can result from problems such as traumatic injuries, infections, metabolic
problems and exposure to toxins. One of the most common causes is diabetes.  In many cases,
peripheral neuropathy symptoms improve with time, especially if the condition is caused by an
underlying condition that can be treated. A number of medications are used to reduce the
painful symptoms of peripheral neuropathy."

right leg, polycystic ovarian syndrome,[2] asthma, bronchitis, bipolar disorder, arthritis, and an enlarged inflamed larynx. Plaintiff's application was denied on November 5, 2010. On December 14, 2011, a hearing was held before an Administrative Law Judge. On January 19, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On May 20, 2013, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."

---

http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/basics/definition/con-20019948

[2]"Polycystic ovary syndrome is a common hormonal disorder among women of reproductive age. The name of the condition comes from the appearance of the ovaries in most, but not all, women with the disorder -- enlarged and containing numerous small cysts located along the outer edge of each ovary (polycystic appearance)."
http://www.mayoclinic.org/diseases-conditions/pcos/basics/definition/con-20028841

Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

Yes = not disabled.
No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Jennifer Teixeira, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1980 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1980 | $ 622.48 | 1996 | $ 776.13 |
| 1981 | 5,389.93 | 1997 | 3,576.80 |
| 1982 | 5,875.51 | 1998 | 4,537.08 |
| 1983 | 0.00 | 1999 | 12,413.08 |
| 1984 | 0.00 | 2000 | 6,810.06 |

| | | | |
|---|---|---|---|
| 1985 | 210.97 | 2001 | 5,336.77 |
| 1986 | 0.00 | 2002 | 0.00 |
| 1987 | 636.38 | 2003 | 0.00 |
| 1988 | 0.00 | 2004 | 576.31 |
| 1989 | 0.00 | 2005 | 0.00 |
| 1990 | 253.60 | 2006 | 0.00 |
| 1991 | 0.00 | 2007 | 0.00 |
| 1992 | 0.00 | 2008 | 0.00 |
| 1993 | 0.00 | 2009 | 0.00 |
| 1994 | 0.00 | 2010 | 0.00 |
| 1995 | 0.00 | 2011 | 0.00 |

(Tr. at 124-126).

**Function Report**

In a Function Report dated July 27, 2010, plaintiff indicated that her conditions do not affect her ability to use her hands, follow instructions or get along with others (Tr. at 156).

**B.      SUMMARY OF TESTIMONY**

During the December 14, 2011, hearing, plaintiff testified; and Jennifer Teixeira, a vocational expert, testified at the request of the ALJ.

**1.      Plaintiff's testimony.**

At the time of the hearing plaintiff was 47 years of age (Tr. at 33).  She had been separated from her husband for the past two years (Tr. at 33).  Since filing her application for disability benefits on July 7, 2010, plaintiff lived with her 28-year-old son until her husband moved out of their home, and then she moved back to her own home (Tr. at 34).  In November 2010, she moved again but has been living alone since that time (Tr. at 34).  Plaintiff lives in a

bottom-floor two-bedroom apartment (Tr. at 36). She has to climb stairs to get to her apartment (Tr. at 36). She has no trouble getting around her apartment (Tr. at 36-37). Plaintiff has not supported herself financially since she filed her application for disability benefits -- she gets a voucher for her apartment, she gets food stamps, and her rent and utilities are paid by the State (Tr. at 38). She is covered by Medicaid (Tr. at 38).

Plaintiff was 5'3" tall and at the time of the hearing weighed 366 pounds (Tr. at 34). Since she filed her application for disability benefits, the least she weighed was about 340 pounds and the most she weighed was 371 pounds (Tr. at 34). Plaintiff has weighed over 300 pounds at least since 2005 (Tr. at 35). Plaintiff has a valid driver's license and she owns a car (Tr. at 35-36). She does not drive much because she panics (Tr. at 36). She drives to the grocery store and to doctor appointments up to three times a week (Tr. at 46).

Plaintiff completed 9th grade but did not finish 10th grade (Tr. at 37). She did not get a GED (Tr. at 37). Plaintiff can read and write and she can do simple math (Tr. at 37).

Plaintiff last worked in 2004 for G&H Concessions preparing food at Casey Speedway (Tr. at 39-40). She left that job because she could not stand for 8 full hours (Tr. at 40). She worked for Burlington Coat Factory in 2001 as a sales associate (Tr. at 40). She left that job after two months because she moved from Kansas City to Blue Springs and the drive was too long (Tr. at 40). Also in 2001 she worked for Door Knock Medical Systems packaging medical supplies (Tr. at 40-41). She stood and walked most of the day at that job (Tr. at 41). She was fired for not working fast enough (Tr. at 41). Plaintiff worked for Red X, a grocery store, from 1997 until 2000 as a cashier (Tr. at 41). She left that job because it became hard for her to be around people -- she would panic (Tr. at 41). Plaintiff had a hard time getting along with one of her managers who was "very, very intimidating" (Tr. at 50-51). She became anxious and panicky with the public (Tr. at 51).

Plaintiff was asked for the main reason why she has not been able to work since July 2010 (Tr. at 42). She said her mental problems are the most difficult (Tr. at 42). She sees a doctor once a month and she is in group therapy (Tr. at 42-43). In group therapy, the people discuss their challenges in life and give each other input (Tr. at 43). Plaintiff's transportation is provided (Tr. at 43).

Plaintiff has breathing problems -- it is hard for her to walk form a car to her home, but she can do it (Tr. at 43). Plaintiff is not sure what causes her breathing problems -- it could be her weight, it could be asthma or possible chronic obstructive pulmonary disease (Tr. at 44). Plaintiff has tried to reduce her weight by riding a stationary bike (Tr. at 44). She gets very winded and has to use an inhaler after five minutes (Tr. at 44). A friend put plaintiff in Weight Watchers and after a month she had only lost a pound (Tr. at 44). Plaintiff testified that she followed the diet, and she has been on a diabetic diet (Tr. at 44).

Plaintiff was 27 years of age when she started using methamphetamine (Tr. at 45). She last used it "six to eight years ago" (Tr. at 45). Although plaintiff's records indicate that in July 2010 she reported, "I am separating from my husband and I used meth about one time a month," she did not actually use methamphetamine then, she was only afraid she would (Tr. at 45). "I may have, I don't know for sure, I may have . . . but no, I was not using meth one time a month." Plaintiff used other drugs when she was in high school, but not as an adult (Tr. at 45).

Plaintiff shops for groceries but it wears her out (Tr. at 46). She does not prepare full meals because she is only preparing food for one person and heating things up is easier and less time consuming (Tr. at 46). She is able to do dishes, she is able to do laundry, she is able to make her bed (Tr. at 46). Plaintiff had planned to meet with someone the day after the hearing

from "Home Healthcare" who was going to provide housekeeping services for her (Tr. at 46). Plaintiff gets winded when she does housework (Tr. at 47).

Plaintiff can stand for about 20 minutes at a time twice out of an 8-hour day (Tr. at 51). Plaintiff thinks she has carpal tunnel syndrome but she has never been diagnosed with it (Tr. at 51). In any event, in her function report she said she has no trouble using her hands (Tr. at 156).

Plaintiff has two adult sons (Tr. at 47). She sees one son frequently; he lives in Kansas City (Tr. at 48). The other son she sees less frequently because it takes a lot of gas to go visit him (Tr. at 48). Plaintiff talks to her father on the telephone (Tr. at 48). She has a few friends from church (Tr. at 48). She attends church services on Sundays from 9:30 in the morning until 12:30 (Tr. at 48). She had been to a movie once that summer with a friend (Tr. at 48). It was a three-hour movie and she was "kind of" able to sit through it (Tr. at 48). Plaintiff eats in restaurants if people from church take her (Tr. at 49).

On an average day, plaintiff will get up at 7:30 a.m., although some days she does not get up at all (Tr. at 49). She goes to TAT, her group therapy, then comes home and has lunch, does whatever chores she needs to do, runs errands outside the house if she has any, and watches television (Tr. at 49). Three or four days a week plaintiff does not feel like getting out of bed (Tr. at 50).

Plaintiff's medications cause her to lose concentration and to feel tired (Tr. at 50).

## 2. Vocational expert testimony.

Vocational expert Jennifer Teixeira testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes medical supplies packager, DOT 920.587-018, medium, unskilled with an SVP of 2; and grocery store cashier, DOT 211.462-014, light with an SVP of 3 (Tr. at 42).

The first hypothetical involved a person limited to sedentary work who could only occasionally climb ramps and stairs, balance, stoop, crouch, or crawl; never climb ladders, ropes or scaffolds; should avoid concentrated exposure to fumes, odors, dusts and gases; is limited to tasks that can be learned in 30 days or less involving no more than simple work-related decisions with few workplace changes (Tr. at 52). The vocational expert testified that such a person could work as a document preparer, DOT 249.587-018, sedentary unskilled with an SVP of 2. There are 4,802 jobs in Missouri and 204,449 in the country (Tr. at 52). The person could also work as a stem mounter, DOT 725.684-018, sedentary unskilled, with 2,740 in Missouri and 180,440 in the country (Tr. at 52). The person could work as a lens inserter, DOT 713.687-026, sedentary unskilled with 6,890 in Missouri and 229,240 in the country (Tr. at 52). The maximum number of unscheduled absences per month permitted would be one (Tr. at 53).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Deborah Van Vleck entered her opinion on January 19, 2012 (Tr. at 11-24).

Step one.  Plaintiff has not engaged in substantial gainful activity since her application date, July 7, 2010 (Tr. at 13).

Step two.  Plaintiff has the following severe impairments:  extreme obesity, class III, with a weight range of 346 to 370 pounds on a 5'3" frame for a body mass index range of 61.3 to 65.5, with related hypertension, hyperlipidemia, diabetes mellitus type II, obstructive sleep apnea, possible right lower extremity neuropathy, and polycystic ovarian disease; asthma; and a mental impairment variously diagnosed to include depression, bipolar disorder, and premenstrual dysphoric disorder (Tr. at 13).  Plaintiff's adrenal adenoma is a nonsevere impairment; her inflamed larynx is a nonsevere impairment (Tr. at 13).  Plaintiff's cervical

radiculopathy is a nonsevere impairment because there is no indication that it causes more than minimal limitations in her functional abilities (Tr. at 14). Arthritis is not a medically determinable impairment as there is no indication in the record that plaintiff has been diagnosed with arthritis, and plaintiff's physical examinations do not reflect any problems with her joints (Tr. at 13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13-16). Although the former listing for obesity has been rendered obsolete, the ALJ considered plaintiff's obesity in determining whether plaintiff's impairments meet or equal any listing (Tr. at 14).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work except she can only occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, crouch, kneel or crawl; must avoid concentrated exposure to pulmonary irritants such as fumes, odors, gases and dusts; and is limited to tasks that can be learned in less than 30 days and involving no more than simple work-related decisions and few workplace changes (Tr. at 16). With this residual functional capacity, plaintiff cannot perform her past relevant work as a hand packager or a cashier (Tr. at 22).

Step five. Plaintiff is capable of working as a document preparer, a stem mounter, or a lens inserter, all jobs available in significant numbers (Tr. at 23). Therefore she is not disabled (Tr. at 23).

## VI. *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. *CONSIDERATION OF RELEVANT FACTORS*

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v.

Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

The claimant reports that she is unable to work due to a variety of both physical and mental impairments. She testified that the largest barrier to her working is her mental impairments. The claimant testified that on three to four days a week she does not want to get out of bed. She further testified that she has a difficult time dealing with the public and becomes panicky. The claimant also testified to difficulty with walking due to shortness of breath caused by her weight and her asthma. She reports problems lifting, squatting, bending, standing, kneeling and climbing stairs. In addition, the claimant reports problems with urinary incontinence.

* * * * *

In terms of the claimant's alleged mental impairments, the evidence of record does not support the extent or severity of the . . . symptoms and limitations alleged. The claimant's treatment notes reflect that her condition is significantly improved with medications. In June of 2009, the claimant reports that her mood is improved and she is in good spirits. In September of 2009, the claimant reports that her mood is stable and that the combination of medications that she is on is working well for her. In March of 2010, the claimant reports that her mood is okay and she is seeing improvements in energy. In July of 2010, the claimant reports that her mood i[s] continuing to improve. In September of 2010, the claimant is noted as being calm with good motivation. In March of 2011, the claimant reports getting out more and feeling hopeful. In June of 2011, the claimant reports an improved mood. The claimant's most recent treatment note from September of 2011, reflects that her mood is stable, she has adequate motivation, no racing thoughts, no distractibility, and no mood swings. These treatment notes reflect that the claimant's condition is continually improving, and does not support the extent or severity of the symptoms and limitations that she alleges.

In terms of the claimant's sleep difficulties, the evidence of record reflects that when she uses a CPAP machine and takes her medications she gets adequate sleep. Additionally, the claimant does not always report fatigue as being an issue. It is also worth noting that the claimant's treatment notes reflect her as being alert and oriented, which would not be the case if she were experiencing excessive daytime fatigue. Thus, the evidence of record fails to support the extent of the claimant's alleged sleeping difficulties and daytime fatigue.

In terms of the claimant's difficulty interacting with the public and supervisors, the record as a whole fails to support that this alleged problem justifies any limitations in the claimant's functional abilities. The claimant's treatment notes reflect that she has an appropriate mood and affect during her physical appointments, demonstrating her ability to maintain appropriated social functioning in public. In addition, her psychological treatment notes reflect that she is no longer experiencing mood swings, and there is no mention of panicking when she is in public. The claimant is able to go to church regularly, and to socialize with those at church. She testified that she is able to go to the movie theater, the grocery store and out to eat without any mention of problems caused by her mental impairments. Additionally, the claimant reports that she has no difficulty getting along with others [in her administrative paperwork]. Therefore, the evidence of record fails to support that the claimant requires any limitations in interacting with others in the workplace.

In terms of the claimant's alleged inability to get out of bed three to four times a week, the record as a whole fails to support the extent of this allegations. . . .  It is also worth noting that there is no mention of this problem in the claimant's treatment notes.  If the claimant were experiencing as much difficulty getting out of bed as she alleges, one would expect her to report the problem to her physicians.  Thus, the record as a whole fails to support the claimant's allegation that she stays in bed three to four days a week.

. . . The claimant's testimony as to her ability to carry out household chores, like laundry and dishes, also supports that she is able to carry out tasks at this level because they require the claimant to understand, remember and carry out simple steps.  She did not testify to any mental difficulties carrying out these tasks. . . .

In terms of the claimant's physical impairments, the record as a whole fails to support the extent and severity of the symptoms and limitations alleged by the claimant. Despite the claimant's impairments, she has maintained relatively normal physical examinations. The claimant's treatment notes generally reflect a normal gait and range of motion, with normal strength, sensation and reflexes throughout the extremities. These physical examinations do not support the extent or severity of the claimant's alleged symptoms and limitations.

In addition, the claimant's treatment notes generally reflect that her impairments are well controlled with medication.  When the claimant is compliant with her medications, her asthma, diabetes, hypertension and hyperlipidemia are all considered to be stable or controlled.  However, when the claimant's obesity is combined with these impairments, including the possibility [of] peripheral neuropathy in the right lower extremity, some limitations are warranted by the record.  It is credible based on the claimant's conditions that she is going to have some difficulty standing and walking.  Thus, the undersigned has limited the claimant to standing and walking for only two hours in an eight-hour workday.  The normal physical examinations and gait noted above support that the claimant is able to stand and walk to this extent.  The claimant's ability to perform her own shopping further supports that she is able to perform at this level because shopping involves walking around the store [based on claimant's testimony].

The undersigned has also limited the claimant to lifting only 10 pounds occasionally and less than 10 pounds frequently in order to prevent the claimant from over exerting herself.  The claimant testified that she is able to do her laundry, which involves carrying her laundry to [a] laundry room.  Her ability to perform this activity supports that she is able to lift and carry weight at this level.  Additionally, the normal physical examinations discussed above reflect no problems with the claimant's upper extremities, further supporting her ability to lift and carry weight at this level.  There is nothing in the record to support that the claimant is limited in her ability to sit for at least six hours in an eight-hour workday.  The claimant herself did not report any limitations in this area of functioning.  Therefore, the evidence of record supports that the claimant is able to sustain work at the sedentary exertional level.

The undersigned has also limited the claimant's postural movements in order to accommodate for her obesity and related breathing disorder.  The claimant's ability to

occasionally climb ramps and stairs is supported by the normal physical examinations described above. If the claimant were unable to perform these activities on an occasional basis, one would expect to see some loss of muscle tone and likely an abnormal gait. The lack of these findings supports that she is able to occasionally climb ramps and stairs. The claimant's activities support that she is able to occasionally balance, stoop, crouch, knell [sic] and crawl. She testified that she is able to do laundry and dishes, both of which require bending and twisting. In addition, the claimant testified that she is able to prepare meals and make her own bed, also requiring her to perform movements similar to those prescribed in the above residual functional capacity. There is nothing in her treatment notes to support that she is unable to sustain work that requires her to perform these movements on an occasional basis.

In terms of the claimant's asthma, not only has the undersigned limited the claimant's exertional capacity but she has also limited the claimant's exposure to pulmonary irritants. The claimant's treatment notes reflect that she generally has good oxygen saturation on room air, has normal pulmonary function examinations and that her asthma is controlled with medications. These treatments notes support that no further limitations are justified based on the claimant's asthma.

The claimant testified that her medications make her tired, interfere with her concentration and cause her to urinate frequently. As discussed above, the record as a whole fails to support that the claimant experiences abnormal daytime fatigue when she is compliant with medications. Additionally, as previously discussed, the record supports that the claimant is able to sustain the concentration required to perform the unskilled work described in the above residual functional capacity. . . .

A number of inconsistencies in the record erode the claimant's overall credibility. For starters, the claimant testified that she last used methamphetamine six to eight years ago. However, on two occasions, the claimant's treatment notes reflect that she reports regular use in 2010. On another occasion, she reports that she stopped using methamphetamine in 2007. The claimant also testified that she has not done any volunteer work since she filed her application, but her treatment notes reflect that she is volunteering at the Salvation Army with her Aunt. It is also worth noting that the claimant reports that she does not take care of anyone, but her aunt reports that she often cares for her grandchildren. Although the inconsistent information provided by the claimant may not be the result of a conscious effort to mislead, . . . the inconsistencies suggest that the information provided by the claimant may not be generally reliable.

The claimant also has a poor work history, which raises a question as to whether her current unemployment is actually a result of her impairments. The claimant's earnings record reflects sporadic earnings, with large gaps years prior the claimant's alleged onset date. In addition, the claimant's treatment notes reflect that she was actively seeking work[] in July and August of 2010, but was concerned no one would hire her do [sic] to her weight. It is also worth noting that the claimant reports that she left her last position in 2004 because of her conditions but does not allege that she became disabled until 2006. These records and actions suggest that the claimant's current unemployment may be the result of things other than her impairments.

(Tr. at 17-21).

As the ALJ noted, plaintiff's work record does not support her credibility. Plaintiff's lifetime earnings total only $47,015.10 during 26 prior to the year of her alleged onset of disability. This averages only $1,808 per year in earned income. She earned less than $1,500 during the entire 14 years before she claims to have become disabled. This strongly suggests that her unemployment is due to something other than her impairments which she alleges did not become disabling until 2006.

Plaintiff's daily activities do not support her credibility. She is able to live alone. She is able to do her laundry, cooking, cleaning and grocery shopping. She takes care of two dogs and sometimes cares for her grandchildren. Her medical records reflect that she had difficulty with transportation (i.e., she indicated she could come to pick up medication on Saturdays but not during the week) suggesting that her alleged mental impairment does not prevent her from running errands but rather lack of transportation was the cause. She testified that she went to the movies, she spends several hours in church each Sunday, she went out to eat with her friends, she participated in group therapy, and her records reflect that she performed volunteer work with the Salvation Army. All of these activities contradict her testimony that she suffers from disabling anxiety around people.

Plaintiff's medical records establish that her symptoms were under control as long as she complied with treatment.

Plaintiff's medical records establish that the precipitating and aggravating factors were her separation from her husband, her inability to find a job, and her lack of money to pay for rent, utilities, food, and medication without government assistance.

The medical records establish that plaintiff was kept on the same dose of the same medications for long periods of time, oftentimes experiencing a change in prescription only

due to cost or the ability to get certain medications free of charge. Plaintiff consistently denied medication side effects, consistently reported that her medication was working fine and she wanted to continue with the same medications, and her doctors apparently agreed, seldom making any changes.

Plaintiff argues that the ALJ ignored plaintiff's testimony that she dropped out of school, had special education classes, and could read but was very slow. This argument is without merit. Plaintiff testified that she dropped out of school because she thought she was "too big for my britches" and when asked whether she was in special education classes, she said, "Maybe one." There is no evidence in any of plaintiff's medical records that she was unable to read or that it was suspected she may have diminished intelligence. In any event, the ALJ's residual functional capacity assessment limits plaintiff to tasks that can be learned in less than 30 days and involving no more than simple work-related decisions, which accounts for any deficiency in plaintiff's ability to read.

I have reviewed the remainder of the record and find that the substantial evidence in the record as a whole supports the ALJ's thorough credibility analysis.

## VII.    OPINION OF SHAHBAZ KHAN, M.D.

Plaintiff argues that the ALJ erred in giving no weight to the opinion of Dr. Shahbaz Khan, plaintiff's long-time treating psychiatrist, without giving good reason.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the

treatment relationship and the frequency of examination; nature and extent of the treatment

relationship; supportability, particularly by medical signs and laboratory findings; consistency

with the record as a whole; and other factors, such as the amount of understanding of Social

Security disability programs and their evidentiary requirements or the extent to which an

acceptable medical source is familiar with the other information in the case record. 20 C.F.R.

§§ 404.1527, 416.927.

The ALJ had this to say about Dr. Khan's opinion:

The opinion of the claimant's psychiatrist, Shahbaz Khan, M.D., is afforded no weight by the undersigned because it is inconsistent with the underlying treatment notes and the record as a whole. Dr. Khan opined that the claimant has moderate limitations in her ability to carry out activities of daily living, as well as in her ability to maintain social functioning. As discussed above, the record as a whole supports only mild limitations in these areas of functioning. In addition, Dr. Khan opines that the claimant has repeated episodes of decompensation, each of extended duration. The claimant's treatment notes reflect that she is not suicidal and she has never been hospitalized because of her mental impairments. The claimant is also able to live on her own and maintain a household. Thus, it is clear that the claimant has not experienced repeated episodes of decompensation. Additionally, as discussed throughout the herein opinion, the claimant's treatment notes from Dr. Khan reflect significant improvements with medication, which is inconsistent with his opinion. His treatment notes also reflect global assessment of functioning scores between 55 and 70, reflecting only mild to moderate symptoms and limitations. Dr. Khan also opines moderate limitations in the claimant's ability to maintain concentration and attention for extended periods, but his treatment notes reflect that she has fair to good attention and concentration. Therefore, because Dr. Khan's checkbox opinion is inconsistent with his own underlying treatment notes, as well as the record as a whole, the undersigned affords his opinion no weight.

(Tr. at 21).

On December 8, 2010, Shahbaz Khan, M.D., completed a Mental Impairment

Evaluation and a Mental Residual Functional Capacity Assessment (Tr. at 448-454). Dr. Khan

found that plaintiff had moderate restriction of activities of daily living; moderate difficulties in

maintaining social functioning; moderate difficulties in maintaining concentration, persistence

or pace; and "moderate" repeated episodes of decompensation, each of "extreme" duration (Tr.

at 448). The choices on this form were none, mild, moderate, marked and extreme. He found that plaintiff had no limitation in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to be aware of normal hazards and take appropriate precautions

He found that plaintiff had a slight limitation in the following:

- The ability to carry out very short and simple instructions

- The ability to sustain an ordinary routine without special supervision *(Dr. Khan actually found that plaintiff has both a "slight" limitation and a "moderate" limitation in this ability)*

- The ability to make simple work-related decisions

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

He found that plaintiff had a moderate limitation in the following:

- The ability to understand and remember detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them *(Dr. Khan actually found that plaintiff has both a "moderate" and a "marked" limitation in this ability)*

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to set realistic goals or make plans independently of others *(Dr. Khan actually found that plaintiff has both a "moderate" and a "marked" limitation in this ability)*

He found that plaintiff had a marked limitation in the following:

18

- The ability to carry out detailed instructions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

The ALJ found that plaintiff was limited to tasks that can be learned in less than 30 days involving no more than simple work-related decisions and few workplace changes. Therefore, the relevant part of Dr. Khan's opinion is plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. As the ALJ found, there is no support for these limitations in any of the records from Tri-County Mental Health, of summary of which follows.

On June 13, 2009, plaintiff saw Dr. Khan (Tr. at 316-317). Plaintiff was living with her husband, was noted to have a supportive family, denied any medication side effects, was sleeping okay and was eating okay. Overall her moved was improved, and she had lost some weight. "The patient is in good spirits. Wants to continue the medication." Dr. Khan observed that plaintiff had good grooming and hygiene, she was alert, fully oriented, with good attention and good concentration. Her memory was intact. Her mood was euthymic[3] with "slight anxiety." She had no hallucinations, no delusions, her speech was goal directed, insight and judgment were good, and she had no suicidal or homicidal ideation. He assessed major

---

[3]Pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated.

depressive disorder in remission and anxiety disorder not otherwise specified.[4]  Her GAF was 65.[5]  He was out of Lexapro[6] samples and told plaintiff to call the following week.  He provided a prescription for Xanax[7] with one refill.  Dr. Khan recommended therapy.  "The patient, at this time, does not have transportation."

On June 22, 2009, plaintiff was contacted by Tri-County Mental Health about picking up samples of medication (Tr. at 315).  Plaintiff indicated she could "only come in on Saturdays."  Because the office was not open on Saturdays, plaintiff's medication was given to a relative for delivery.

On August 7, 2009, plaintiff went to Tri-County Mental Health and requested medication refills (Tr. at 313).  Plaintiff was given samples of Lexapro.  "Clt also states she has been taking Xanax QHS [every night at bedtime] and PRN [as needed].  Cl reports she is running out of Xanax.  Notified clt that she should not be out of Xanax until 8/12/09 and would only be able to give her 1 tab as only given enough meds until 8/13/09."

On August 13, 2009, plaintiff went to Tri-County Mental Health and said she was interested in applying for Medicaid benefits (Tr. at 311-312).  Amy Holt assisted plaintiff in completing her application.  "Writer linked client with information that would assist with social security claim."  Plaintiff was noted to be appreciative and thanked Ms. Holt.  Plaintiff

---

[4]This designation, abbreviated NOS, can be used when the mental disorder appears to fall within the larger category but does not meet the criteria of any specific disorder within that category.  Therefore, plaintiff's symptoms appear to fall within the larger category of anxiety disorder but do not meet the criteria of any specific disorder.

[5]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[6]Treats anxiety and major depressive disorder.

[7]A schedule IV controlled substance, Xanax is a benzodiazepine used to treat anxiety.

was given samples of Lexapro, and a prescription for Xanax was called in to her pharmacy.

On September 14, 2009, plaintiff called Tri-County Mental Health and requested a refill of Xanax (Tr. at 309). The request was approved.

On September 19, 2009, plaintiff saw Dr. Khan (Tr. at 307-308). Plaintiff was living with her husband and was noted to have a supportive family. She denied any medication side effects. "The patient reports recently she was diagnosed with polycystic ovarian disease." Plaintiff said that during her menstrual cycle she feels irritable, anxious, angry, and snappy and she reported a poor frustration tolerance. "Other than that, mood has been stable, sleeping okay and eating okay. Some financial difficulties but her husband is working." Plaintiff reported no suicidal or homicidal ideation, no hopelessness, and she said her medication was working fine. Dr. Khan observed that plaintiff was alert and fully oriented, cooperative and pleasant. Her attention was fair, concentration was fair, memory was fair. Mood was euthymic, affect was congruent. Her insight and judgment were intact. Dr. Khan assessed major depressive disorder in remission, anxiety disorder not otherwise specified, and premenstrual dysphoric syndrome. He assessed a GAF of 65. He continued plaintiff on Xanax and Lexapro (with samples given).

On October 27, 2009, plaintiff's aunt picked up samples of Lexapro for plaintiff (Tr. at 306).

On November 14, 2009, plaintiff saw Dr. Khan at Tri-County Mental Health (Tr. at 304-305). Plaintiff denied any medication side effects. She was living with her husband and was noted to have a supportive family. "The patient reports mood is improved. Sleep is better. Anxiety has been under control. She has been going out to Salvation Army to do volunteer services with her auntie." Plaintiff had been going to a pro-recovery group and had been having some exposure to social situations, "handing it well without any decompensation or

deterioration in depression or anxiety." Plaintiff denied any hopelessness, helplessness or suicidal ideation. Dr. Khan observed that plaintiff was casually dressed with good grooming and hygiene. She was alert, cooperative and fully oriented. She had a normal mood, insight and judgment were fair, motivation was fair. He assessed major depressive disorder in remission, premenstrual dysphoric syndrome and anxiety disorder not otherwise specified. Her GAF was 65 to 70. He prescribed Xanax with one refill, and he gave her samples of Lexapro. "The patient has been encouraged to do therapy as mother's death anniversary is around the corner and she needs some counseling and support."

On November 25, 2009, plaintiff called Tri-County Mental Health and said she needed a refill of Xanax (Tr. at 302). The medical records indicated plaintiff had been given a refill nine days earlier; therefore, her request was denied.

On December 10, 2009, plaintiff left a voicemail at Tri-County Mental Health (Tr. at 300). Plaintiff "reported that she has separated from her husband and [is] living with her children. She said that she is taking two Xanax during the day, and two at bedtime to sleep." Dr. Khan approved a refill of Xanax but informed plaintiff that "she has to take them as ordered because there will [be] no early refill."

On December 17, 2009, plaintiff sent someone to Tri-County Mental Health to request samples of medications (Tr. at 298). Lexapro samples were provided.

On January 10, 2010, plaintiff saw Dr. Khan for a follow up (Tr. at 296-297). Plaintiff was separated from her husband and living with her son. Plaintiff denied all mental health symptoms except being "somewhat sad with anxiety" and she felt overwhelmed. Dr. Khan observed that plaintiff was alert and fully oriented, and cooperative. She had no hallucinations, no delusions, her speech was goal directed, her insight and judgment were noted to be fair "although she is reluctant to go for divorce or file charges against the

husband" and she had no homicidal or suicidal ideation. Dr. Khan assessed major depressive disorder, premenstrual dysphoric syndrome, and anxiety disorder not otherwise specified. Her GAF was 60 to 65. He provided her with samples of Lexapro. He prescribed Xanax: "Medication not to be refilled before January 23, 2010 as the patient has medications from the last visit in November. She just got the refill filled recently so she has a month supply of medication." Therapy was recommended.

On January 21, 2010, plaintiff went to Tri-County Mental Health and requested samples of her medication (Tr. at 295). She was given samples of Lexapro.

On February 19, 2010, plaintiff went to Tri-County Mental Health to pick up samples (Tr. at 294). Her Medicaid had lapsed. "Will continue working on getting it active again next week." Plaintiff reported that she was doing well on her medication. She was given samples of her medication.

On February 26, 2010, plaintiff called Tri-County Mental Health to request a refill of Xanax (Tr. at 293). When the nurse tried to call plaintiff back to tell her a prescription had been called in, she was unable to reach plaintiff and left a message.

On March 6, 2010, plaintiff was seen for medication management (Tr. at 263-264, 290-292). She saw Dr. Khan and also saw a counselor. Plaintiff told Dr. Khan that she was "currently separated from her husband then goes back then stays with her children and grandchildren whenever she has an argument. It has been kind of an unstable relationship for a while now." Plaintiff indicated that she enjoyed her grandchildren. Plaintiff said her mood was okay, she felt no hopelessness, no helplessness, no anhedonia. There was improvement in her energy. She was having no nightmares or flashbacks. She denied suicidal thoughts and wanted to continue her same medications. Dr. Khan observed that plaintiff was alert, fully oriented, and casually dressed. Her attention and concentration were intact. Her memory was

normal, mood was euthymic, speech was goal directed, insight and judgment were overall

intact except limited in the area of relationship problems. He assessed major depressive

disorder in partial remission, premenstrual dysphoric syndrome, and anxiety disorder not

otherwise specified. Her GAF was 65 to 70. He provided samples of Lexapro and samples of

Xanax. Dr. Khan discussed a healthy lifestyle and sleep hygiene.

That same day when plaintiff met with a counselor, she was asked about her obstacles

and she said, "My weight." Plaintiff had quit smoking three months earlier. Plaintiff was

advised to walk 20 minutes at a time 7 days a week. She was told not to snack between meals.

Plaintiff agreed with this plan.

On March 29, 2010, plaintiff called Tri-County Mental Health asking for a prescription

for Ambien[8] (Tr. at 289). "[R]eports she did well on Ambien when another doctor prescribed it

in the past." A prescription was called into a pharmacy. A little later that day, plaintiff went to

Tri-County Mental Health to pick up samples of Lexapro (Tr. at 288).

On April 19, 2010, plaintiff went to Tri-County Mental Health to pick up samples of

Lexapro (Tr. at 287).

On April 30, 2010, plaintiff went to Tri-County Mental Health to complete paperwork

for the Patient Assistance Program in order to obtain free Lexapro (Tr. at 286).

On May 1, 2010, plaintiff saw Dr. Khan at Tri-County Mental Health Services (Tr. at

283-285). Plaintiff indicated she recently lost her mother to cancer. "Some sadness, but the

patient has support. Supportive church group, family. The patient has some sadness, but

sleeping okay, eating okay. No auditory or visual hallucinations. No paranoia. No suicidal

thoughts. No guilty feelings or guilt of the surviving. Reports medications working okay.

Wants to continue as it is." Dr. Khan observed that plaintiff was casually dressed, alert, fully

---

[8]A schedule IV controlled substance, Ambien treats insomnia.

oriented. Her grooming and hygiene were fair, her affect was tearful when talking about her mother but well controlled. Speech was goal directed. Insight and judgment were fair. She had no hopelessness. He assessed major depressive disorder, premenstrual dysphoric syndrome and anxiety disorder not otherwise specified. Her GAF was 65. He gave her 21 tablets of Lexapro with no refills and 30 tablets of Xanax with no refills. He discussed with her a healthy lifestyle and sleep hygiene. "Grief counseling offered. The patient feels okay and declined."

On May 24, 2010, plaintiff was telephoned and a voicemail was left telling her that her Lexapro medication had been received by Tri-County Mental Health Services through the Patient Assistance Program (Tr. at 282).

On May 25, 2010, plaintiff called her pharmacy to get a refill of Xanax that had last been filled there on April 7, 2010 (Tr. at 281). The pharmacy called Tri-County Mental Health for approval. Dr. Vlach, in Dr. Khan's absence, permitted enough "to last until appt. [on June 5]" but indicated that "the medication was not permitted to be released to plaintiff until May 28, 2010."

On June 3, 2010, plaintiff left a voicemail at Tri-County Mental Health indicating that she had not been able to get a ride to pick up her PAP (Patient Assistance Program) medication and asked if it would be a problem if she did not take it until her appointment in two days (Tr. at 280). Sharon Wright, RN, called plaintiff back three times but did not reach her and left messages to call the office.

On June 5, 2010, plaintiff was seen at Tri-County Mental Health by Dr. Khan (Tr. at 278-279). Plaintiff was separated from her husband. "The patient will be starting therapy at Synergy. The patient has a church group that is supporting her, good friends. The patient reports sadness, going through bereavement of the loss of the relationship, with some sleep

problems. No psychosis. No suicidal or homicidal ideations. Good support system. Appears to be motivated." Dr. Khan observed that plaintiff was casually dressed, alert, fully oriented, calm, and cooperative. Her thoughts were rational, her speech was goal directed, her attention was intact, concentration was intact, memory was intact. He observed no psychosis, and plaintiff denied suicidal and homicidal ideation. Plaintiff was "tearful when talking about her relationship." Dr. Khan assessed major depressive disorder, premenstrual dysphoric syndrome, and relationship problems. He assessed a GAF of 60 to 65. Dr. Khan provided samples of Lexapro (28 tablets), Xanax (15 tablets), and Seroquel[9] (16 tablets), with no refills of anything, and noted "the patient cannot afford any basic sleep medications."

On June 7, 2010, plaintiff called Tri-County Mental Health Services requesting 30 Xanax tablets "versus 15 due to cost" (Tr. at 277). Dr. Khan was consulted and he told plaintiff that Xanax was "just temporary" and he would be tapering her off that medication. He said "15 tablets needed to last plaintiff 30 days." When plaintiff was informed of this, she said, "I'm not ready for that!" Plaintiff said that Seroquel was too sedating and she did not feel she could take that medication. She was told that would be discussed at her next appointment with Dr. Khan.

On June 15, 2010, plaintiff called Tri-County Mental Health Services and left a voicemail canceling her appointment with Dr. Kahn due to being sick (Tr. at 277). She said that her aunt was in the day program and asked if Dr. Kahn could give medication samples to plaintiff's aunt for her. Lexapro and Seroquel tablets were provided to plaintiff's aunt.

On July 2, 2010, plaintiff saw Dr. Khan for a follow up (Tr. at 275). She had been living in a house by herself. "Patient is separated now and is going through financial problem[s] because she is not getting to pay off her husband, having difficulties maintaining

---

[9]Treats schizophrenia, bipolar disorder, or depression.

utilities and home payments. Patient afraid of losing them. Patient has been crying and searching for a job without any success." Plaintiff reported sadness, poor sleep and worries. She denied hopelessness and suicidal thoughts. She felt helpless "in regards to finding a job and her financial issues." Dr. Khan observed that plaintiff had good grooming and hygiene. Her attention was intact, concentration was intact, memory was intact, speech was goal directed, she had no suicidal or homicidal ideation. "Patient is motivated but frustrated about not having a job. Does not feel hopeless." Dr. Khan assessed major depressive disorder and premenstrual dysphoric syndrome with a GAF of 60 to 65. He discontinued Xanax since plaintiff had not been taking it due to cost. He prescribed Seroquel and gave plaintiff samples. He prescribed Lexapro and gave samples. He recommended vocational rehabilitation.

Afterward plaintiff saw Virginia Schneider at Tri-County Mental Health Services (Tr. at 273-274). Ms. Schneider "helped Kelly complete forms for Medicaid and food stamps as well as giving her brochures about employment." Plaintiff was observed to be tearful and visibly shaking, saying that her life was a mess and out of control. Plaintiff planned to take the forms to Platt County "to apply for entitlements today." Plaintiff was noted to be eager to go to work and agreed to look over brochures about working. Ms. Schneider told plaintiff to come back the following week "to discuss employment issues."

On July 6, 2010, plaintiff was seen at Tri-County Mental Health Services by Virginia Schneider to go over the employment pamphlets plaintiff had been given and to report on how she was doing in her abusive marriage and with her medications (Tr. at 271-272). "This CPS also inquired if she had the employment/vocational phamplets [sic] and how it went last week applying for entitlements (food stamps and Medicaid) at Platte County DFS last week. This CPS asked Kelly if she needed or would benefit from therapy." Plaintiff reported that she had slept well over the weekend, she filled out her applications and was awarded food stamps but had

been denied Medicaid a couple months earlier. Plaintiff moved back into her own home, but she said, "It is just a matter of time before the lanlord [sic] kicks her out for nonpayment of rent. Kelly also states to this CPS that she still wants to find a job but is continuing to be concerned that no one will hire her due to her weight." A "supported employment" referral was prepared.

On July 15, 2010, plaintiff telephoned Tri-County Mental Health Services and said she was crying all the time and needed a medication change (Tr. at 270). Dr. Khan prescribed Buspar.[10] When Sharon Wright, RN, called plaintiff back to tell her Dr. Khan had prescribed Buspar, plaintiff said she "could not afford to pay even the $4.00 for meds. Asked for Cymbalta or sample med." Dr. Khan had left for the day, and plaintiff was given instructions to call 911 if she felt she may harm herself -- plaintiff said she did not plan to harm herself.

On July 16, 2010, plaintiff was given a new prescription for Lexapro, Seroquel and Cymbalta[11] as a result of her complaint that she could not afford the Buspar that had been prescribed (Tr. at 269). Plaintiff came into the office and was given samples of Cymbalta and Seroquel.

On July 27, 2010, plaintiff participated in group therapy with Vicki Williams (Tr. at 268). Plaintiff reported going through a "really rough time" in that she was separating from her husband "and I use meth about 1x a month." Plaintiff's aunt had been attending this program and encouraged plaintiff to attend as well. "This writer encouraged this client to stay sober." Plaintiff's plan was to work on her sobriety.

Almost five hours later on the same day, plaintiff saw Dr. Khan from 4:30 to 5:00 p.m. for a follow up (Tr. at 267). Plaintiff denied any medication side effects. "Mood has been

---

[10]Treats anxiety.

[11]Treats depression and anxiety.

slowly improving and still gets tearful episodes and sobbing with the feeling of loss. Denies any guilt, hopelessness, helplessness or suicidal thoughts. . . . No psychosis, no racing thoughts." Dr. Khan observed that plaintiff had a sad, tearful affect "when talking about her husband." He found that she had fair attention, fair concentration, fair memory, goal-directed speech, fair motivation, intact judgment. He assessed major depressive disorder with a GAF of 65. He discontinued her Lexapro and increased her Cymbalta of which he provided 21 sample tablets. He refilled plaintiff's Seroquel and referred to her a day program.

On July 30, 2010, plaintiff called to see if medication samples were available and if they could be given to plaintiff's aunt who could deliver them to her (Tr. at 474). Samples of Cymbalta and Seroquel were given to plaintiff's aunt.

On August 2, 2010, plaintiff's case manager, Virginia Schneider, noted in the record that she called plaintiff to remind her of her appointment the next day with "supported employment" because plaintiff had been referred for job support (Tr. at 473). Ms. Schneider left a message on plaintiff's phone to return the call and reminded her of the next day's appointment. She also told plaintiff that a ride would be provided for her if she needed one.

On August 5, 2010, Virginia Schneider stopped by plaintiff's home (Tr. at 469-471). Ms. Schneider noted that she had previously referred plaintiff to supported employment and DBT Therapy.[12] When she arrived at plaintiff's house, plaintiff did not want her to come in because she said her house was a mess. They sat outside for a few minutes then went inside.

---

[12]Dialectical Behavior Therapy. DBT utilizes a system of stages and target goals to ensure that it does not fall victim to treating present issues only. In addition, DBT uses a progression system that focuses on the most prevalent issues first, such as injurious or harmful conditions, and then reverts to the less pressing issues in order of relevancy to the continuation of treatment. Behavior patterns that negatively impact the client's life, development of coping skills and other extenuating issues are addressed once the primary risk factors have been worked on. Ultimately, the therapist focuses first on sustaining life, secondly on sustaining therapy, and thirdly on providing the resources and tools to effect a positive change in the client's life.

Ms. Schneider observed that plaintiff lacked organizational skills but was able to find all of her paperwork. She showed Ms. Schneider mail from SSDI, food stamps, an eviction letter, and several other papers. "She also asked me about a parking ticket for $28.00 overdue that she was issued a warrant on." Plaintiff was noted to be diligently calling all of the numbers for entitlements. She indicated that she was very interested in getting her life back and being independent. "She has no income and no employment. She is working with supported employment and she is going to contact Maple Woods College to get this done on her own." Ms. Schneider indicated she would check with supported employment regarding GED help. "Kelly is a very sweet young lady and is working hard to maintain independence."

Later that same day plaintiff called Tri-County Mental Health for a phone number to call so she could check on the status of her Medicaid, and she also requested information about the Kansas City Housing Authority (Tr. at 468). Information was provided to plaintiff regarding several housing assistance programs as well as utilities assistance and plaintiff indicated she would call those places.

On August 12, 2010, a case worker at Tri-County Mental Health made a notation in plaintiff's file (Tr. at 467). Plaintiff had an eviction notice for August 15, 2010. "This CRS left message for Kelly to call me. I know she's going through a really bad time right now and this CPS would like an update from Kelly regarding her status. I'm concerned for her mental health and well being. There was no answer on home # or cell #."

On August 13, 2010, plaintiff met with a case worker at Tri-County Mental Health (Tr. at 466). "All entitlements applied for - has received food stamps." Plaintiff had been "diligently making calls to obtain resources". She missed TAP yesterday waiting for return calls. "Kelly will follow through on TAP next week."

On August 17, 2010, plaintiff met with a case worker at Tri-County Mental Health (Tr. at 464-465). Plaintiff said she was being evicted from her home. "When Kelly first visited with this CPS, she applied for all of her entitlements. She received food stamps and is still waiting on disability and Medicaid. She diligently made calls to all resources I linked her to and she got some much needed help in paying her electric bill, her water bill as well as a food pantry which she is able to use throughout the month". Plaintiff said she was going to move into a studio apartment behind her sister-in-law's house. Plaintiff had not followed up yet with TAP due to waiting for return calls but planned to go "this Thursday".

On August 27, 2010, a Diagnostic Revision Form was completed assessing major depressive disorder and premenstrual dysphoric disorder (Tr. at 458). Plaintiff was assigned a GAF of 60.

On August 31, 2010, from 12:30 p.m. to 1:00 p.m., plaintiff was seen at Tri-County Mental Health (Tr. at 455-457). Her reason for being seen was listed as "overwhelmed with medical payments, housing payments, unemployment, depression, and needing help navigating system, stabalizing [sic]." Her assets/skills included "friendly". Her obstacles were, "finances, depression, housing, overwhelmed." A goal was to interact with people more. Plaintiff's counselor recommended she see her kids weekly, get out of the house at least 4 days per week to decrease her isolation, and consider other social outlets.

From 4:30 to 4:45 p.m. that same day, plaintiff saw Dr. Khan for a follow up (Tr. at 463). Plaintiff denied medication side effects. Plaintiff said her mood was improving, she was sleeping well, her appetite was okay. Her energy and motivation were low. She was observed to have good grooming and hygiene. She was "mildly anxious. Otherwise euthymic mood". Her speech was goal directed; she exhibited no psychosis; her insight, judgment and motivation were intact. She was having no suicidal or homicidal ideation. Dr. Khan assessed major

depressive disorder and premenstrual dysphoric disorder and gave her samples of Cymbalta and Seroquel.

On September 14, 2010, medication samples were given to plaintiff's aunt to deliver to plaintiff (Tr. at 462).

On September 30, 2010, plaintiff saw Dr. Khan for a follow up (Tr. at 461). Plaintiff denied any medication side effects. It was noted that plaintiff had been off of her medications "for some time" but no specific medication was identified. She was working on getting medications and getting housing. Her mood had improved, her sleeping was okay, her eating was okay. She had "episodes of short-lived sadness and crying but not pervasive." Plaintiff had no suicidal thoughts. Plaintiff was observed to be calm and cooperative. Her mood was fair, psychomotor activity was normal. Speech was goal directed, insight and judgment were intact. Motivation was good. No suicidal or homicidal ideation was reported or observed. Dr. Khan assessed major depressive disorder and premenstrual dysphoric disorder with a GAF of 60. He provided samples of Cymbalta and Seroquel.

On October 26, 2010, plaintiff was seen for a follow up (Tr. at 459-460). "Same living situation, patient is expecting to receive a housing [voucher] in next couple of weeks patient is excited about it. Patient has improved mood, better motivation, has been going to CSTAR,[13] sleeping well eating okay." Plaintiff denied suicidal thoughts, denied hopelessness, denied any irritability. Plaintiff was observed to have good grooming and hygiene, improve mood, use of humor, improved psychomotor activity. Her mood was euthymic, she exhibited no pressured speech. Her judgment and insight were improved. She "appears optimistic." She reported no suicidal or homicidal ideation. She asked to continue her same medications. Although plaintiff insisted she was medication compliant "because of some old supply", it was noted that plaintiff

[13]Comprehensive Substance Treatment And Rehabilitation.

should have been out of medication for 10 days based on what she had been given previously. Plaintiff was given 2 weeks' worth of Cymbalta and 2 months' worth of Seroquel. She was told to "maintain abstinence from drug and alcohol".

On November 5, 2010, plaintiff's application for Social Security disability benefits was denied.

On November 12, 2010, plaintiff called Tri-County Mental Health for samples of medication (Tr. at 459). Samples of Cymbalta and Seroquel were delivered to plaintiff.

On November 29, 2010, plaintiff came to Tri-County Mental Health to pick up two weeks' worth of samples of Seroquel and Cymbalta (Tr. at 459).

On December 8, 2010, Dr. Khan completed the Medical Source Statement that is the subject of plaintiff's argument.

As the above records reflect, plaintiff was observed to be cooperative, pleasant, calm, appreciative, excited, and "a very sweet young lady." She was never observed to have any difficulty getting along with anyone who provided treatment, counseling, or case-worker services to her. She was able to volunteer with the Salvation Army, she participated in several group activities, and she was noted to be handling socialization "without any decompensation or deterioration in depression or anxiety." This directly contradicts Dr. Khan's finding that plaintiff has repeated episodes of decompensation, each of extended duration. The medical records establish that when plaintiff had difficulty it was due to separating from her husband, not being able to find a job, and not having enough money. She indicated that she was afraid she was not being hired due to her weight, not due to any mental symptoms such as those alleged at the hearing.

Because Dr. Khan's opinion is directly contradicted by his own treatment records, the ALJ properly gave the opinion no weight.

## VIII.   RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity because she "failed to provide a narrative bridge linking the medical evidence with the limitations, and the RFC is not supported by substantial evidence."  Plaintiff argues that the ALJ is required by law to "address every medical opinion and discuss the weight he assessed each opinion."  Finally, plaintiff argues that the ALJ is required to provide a logical bridge between the medical evidence and the result, citing Daniel v. Massanari, 167 F. Supp. 2d 1090 (D. Neb. 2001), or face remand, citing Kelley v. Callahan, 133 F.3d 583 (8th Cir. 1998).

The Eighth Circuit has observed that an ALJ "must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted); 20 C.F.R. §§ 404.1545 and 416.945; SSR 96-8p.  Although formulation of the residual functional capacity is part of the medical portion of disability adjudication, it is not based only on "medical" evidence but, instead, is based on all the relevant and credible evidence in the record.  McKinney v. Apfel, 228 F.3d at 863. Assessing a claimant's residual functional capacity is not solely a "medical question." Pearsall v. Massanari, 274 F.3d 1211, 1217–18 (8th Cir.2001).

An ALJ does not have to rely entirely on a doctor's opinion, nor is he limited to a simple choice of the medical opinions of record when he formulates the residual functional capacity. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the [plaintiff's] physicians") (internal citations omitted). Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]here is no requirement in the regulations for a direct correspondence between a residual functional capacity finding and a specific medical opinion on the functional capacity

in question."). The residual functional capacity assessment is specifically reserved to the Commissioner and the ALJ, not a claimant's doctors. The Commissioner uses medical sources to "provide evidence" about several factors, including residual functional capacity, but the "final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 416.927(d)(2).

An ALJ may make his own assessment based on his review of the record as a whole. Steed v. Astrue, 524 F.3d 872, 865 (8th Cir. 2008) (ALJ's residual functional capacity finding was based on diagnostic tests and examination results); Halverson v. Astrue, 600 F.3d 922, 933-934 (8th Cir. 2010).

Daniel v. Massanari did not discuss any bridge or nexus requirement as argued by plaintiff, and SSR 96-8p does not explicitly require any such thing. In Kelly v. Callahan, also cited by plaintiff, the court of appeals criticized the ALJ for failing to address the opinion of a treating physician which not only corroborated the claimant's allegations but was consistent with the other evidence in the record (of which there apparently was not much, with the exception of the ignored doctor's records). In that case the ALJ had also stated that a doctor is not permitted to provide an opinion as to the number of hours a claimant can work each day, but the court of appeals pointed out that such opinions are not only permitted but encouraged. Neither of those cases support plaintiff's argument that a particular bridge or nexus is required before an ALJ has escaped a mandatory remand.

I have been unable to find any Supreme Court case, Eighth Circuit Case, or Western District of Missouri case that requires such a bridge or nexus when an ALJ assesses a claimant's residual functional capacity. Although Judge Posner, from the Seventh Circuit Court of Appeals, has been quoted by some courts in other jurisdictions with respect to such a nexus, this court is not bound by those opinions but is required to follow the case law of the Western

District of Missouri, the Eighth Circuit Court of Appeals, and the Supreme Court of the United States.

The ALJ is not required to provide each limitation in the residual functional capacity assessment immediately followed by a list of the specific evidence supporting this limitation. See SSR 96-8p. Such would not only be anathema to a finding based on "all of the relevant evidence," but would result in overly lengthy decisions containing duplicative discussions of the same evidence in multiple sections. McKinney v. Apfel, 228 F.3d at 863. Such a requirement for duplicative and exacting discussion of every piece of evidence would only add further delay to the current backlog of cases awaiting decision by an ALJ, a backlog growing by the day. As the Supreme Court has stated, "[t]he disability programs administered under Titles II and XVI are of a size and extent difficult to comprehend," Heckler v. Day, 467 U.S. 104, 106 (1984) and "[t]he need for efficiency is self-evident." Barnhart v. Thomas, 540 U.S. 20, 28-29 (2003) (internal quotations omitted).

Portions of the ALJ's order are quoted above in the section analyzing her credibility analysis. The quoted portion of the order establishes that she reviewed all of the evidence and cited credible evidence in the record to support her finding on each limitation or ability in the residual functional capacity assessment. I have thoroughly reviewed the medical record, the parties' summaries of the medical records, and the ALJ's residual functional capacity assessment, and I find that the substantial evidence in the record as a whole supports the ALJ's finding regarding plaintiff's limitations.

IX.     CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

36

ORDERED that the decision of the Commissioner is affirmed.



/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 1, 2014